**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 21-255** |
| | : | |
| **DAVIT DAVITASHVILI** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                                           **May 9, 2022**

Georgian national Davit Davitashvili and Ukrainian national Olga Volosevich knew each other for several years before marrying in 2016 and residing in Philadelphia. Mr. Davitashvili returned to Georgia when the couple separated in October 2019. The couple then began communicating across thousands of miles by phone and internet messaging services using the Russian language. Mr. Davitashvili sent Ms. Volosevich a message on May 10, 2020 allegedly threatening bodily injury to Ms. Volosevich and others.

Mr. Davitashvili messaged a mutual friend he planned to return to the United States in mid-2021. The mutual friend showed the messages to Ms. Volosevich, who promptly filed a criminal complaint. Judge Strawbridge issued an arrest warrant and law enforcement arrested Mr. Davitashvili upon his arrival in the United States in June 2021. Our grand jury charged Mr. Davitashvili with transmitting a communication containing a threat to injure or kidnap in interstate or foreign commerce under 18 U.S.C. § 875(c). We are now set for trial.

The United States moves for an Order allowing Ms. Volosevich to testify about alleged physical and emotional abuse during their marriage, an alleged rape leading to the couple's October 2019 separation, messages between the couple before and after the May 10, 2020 message, 2021 messages between Mr. Davitashvili and the mutual friend regarding his return, and Mr.

Davitashvili's 2007 conviction for domestic violence. We heard oral argument and presided over an evidentiary hearing so we could analyze the proffered evidence under Federal Rule of Evidence 404. The United States chose not to introduce Ms. Volosevich's or the Federal Bureau of Investigation's agent's testimony to offer context during our hearing.

We today find Ms. Volosevich may offer background testimony and testify as to her view of her dysfunctional relationship with Mr. Davitashvili from November 2019 through June 2020. We also find many, but not all, of the messages between them are admissible at trial. We admit one portion of a message between Mr. Davitashvili and the mutual friend subject to Ms. Volosevich swearing she saw this message shortly before filing the criminal complaint. We preclude mention of an alleged rape in Fall 2019 or of a 2007 conviction. We grant counsel leave to supplement their proposed jury instructions to offer suggested limiting instructions consistent with Federal Rule of Evidence 404.

## I.     Our Grand Jury charges Mr. Davitashvili with issuing threats of physical harm on Ms. Volosevich on May 10, 2020.[1]

Davit Davitashvili married Olga Volosevich in 2016. They lived together in Philadelphia. Ms. Volosevich claims Mr. Davitashvili verbally and physically abused her during their marriage. Mr. Davitashvili, a former professional fighter, allegedly hit her where others would not see the marks, threatened to kill her with one strike of his hand or foot, told her he had a gun for her, and threatened to disfigure her with acid and a knife. Ms. Volosevich claims Mr. Davitashvili also referred to his 2007 conviction for domestic violence to intimidate and threaten her.

They lived together as a married couple until Mr. Davitashvili left their home shortly after he allegedly raped Ms. Volosevich in Fall 2019. Mr. Davitashvili returned to his native country, Georgia, on November 5, 2019.

The two communicated over instant messaging applications during Mr. Davitashvili's time in Georgia.[2] Many of their communications involved mundane matters but several involved harsh language and accusations, mostly from Mr. Davitashvili. Their communications included many messages on May 10, 2020 (two months after the COVID-19 pandemic caused worldwide lockdowns) over the internet from Georgia to Philadelphia using the instant messaging application Viber[3] now translated from Russian:

> Ms. Volosevich (O.V.): Quarantine was extended on our end.

> O.V.: As soon as things open back up, I will file for a divorce.

> Mr. Davitashvili (D.D.): I will answer for what I know to everyone, even USA prostitutes. I see that you know me well. Ha.

> D.D.: Go ahead and come clean. This is my last advice. But you will see how your commanders will get jammed up, whore.

> D.D.: We will see what happens when Tramp [*sic*], the cunt that betrayed the whole USA, is replaced. I am no Jefree Ebshtein [*sic*]. We will see who will win, whore.

> D.D.: Enough for today or tomorrow. Leave me alone. You will get caught if not today, then tomorrow. You will see. You are in the USA, not KGB. Talk, bitch.

> D.D.: I don't fucking care about anything. You are wrong about me. When will I start?! That's when it will all be over. Whore, I don't fucking care even if the FBI is behind you. WILL FUCK YOU UP. I HAVE NOTHING TO LOSE. THEY WILL SEE THAT SOON. WHORE. FOR THOSE WILL APPROACH, THE ONLY THING THAT WILL STOP ME IS DEATH. DON'T FUCKING CARE ABOUT THE BEFORE. GO AHEAD, WHORE, COME CLEAN WHILE YOU ARE THE FIRST SLUT. I HAVE NOTHING TO LOSE. FUCK ALL SYSTEMS LET ME BE THE VICTIM.

> D.D.: You have two paths forward. Either come clean, or the second one is wheelchair. Make a choice, whore, together with your coworkers that soon will be sucking my dick. Hahaha.

> O.V.: I didn't do anything to you, but you did to me,

D.D.: You are a whore in the U.S. When you realize that, it will be too late.

O.V.: I could have put you behind bars long time ago and you know that well.

O.V.: Understand that I am not in Georgia.

O.V.: And talking to you on civil terms is not working out.

D.D.: Unlike Jefree Abshtain [*sic*], I will not end my life. I will get you to answer even if it will cost me my life!!!!!

D.D.: You would have sucked my dick off, whore, until you started breathing. Khatuna knew who you are. So shut your stinking mouth, whore, and be like a dumbass.

O.V.: Are you continuing to threaten me?

O.V.: I am going to be in a wheelchair?

O.V.: I am going write a report on you right now. We will see what kind of a hero you will be before police officers.

D.D.: No one knows what the future holds, whore. Maybe even worse. Believe me, you will be fucked soon.

O.V.: I have plenty of evidence that you are threatening me and that you took me then against my will.

O.V.: You didn't want to do it on good terms.

D.D.: If I start?! Believe me, whore. You won't need evidence. At least you know me. How much I have left. Go ahead and come clean about everything I saw with my own eyes. On good terms while the KGB hasn't have the chance to fuck up in the U.S. I swear, you have my word. And you will be there…

D.D.: Go ahead and file for a divorce. I will figure out the rest when I return.

D.D.: And after everything you are threatening me, whore?! I am not going to leave your DNA if I wish so, slut. I will start with Ukraine, whore.

O.V.: I am not threatening.

> D.D.: Me neither. We will see what the future holds. I cannot control
> myself anymore. You will see and hear when I return what will
> happen to such a KGB like yourself, whore. If I don't have enough
> time to [. . .] everyone, then I will send many who is needed to be
> sent, like cunt Pele and others, in the name of USA, whore. I have
> one life left that needs to end fairly when all of this won't fucking
> matter. I want for everyone to know!!! I will not just depart this life,
> I will take someone with me!!! At least five, I swear. I don't know
> how to gather you all together, but at minimum will take 15 of you
> and will depart this life peacefully. I don't know how to gather you
> all together, dicks. Thinking that after my life, there won't be
> another life in the USA as despicable as what you have caused for
> me, whore.
>
> O.V.: I have a 7-year-old brother. He did nothing bad to you. He is
> my DNA. You also want to kill him, too?
>
> D.D.: May God give him health. He will never grow up to be like
> you, bitches.
>
> D.D.: And just leave my life altogether, please. Go file for a divorce
> please, and free me, and everything will work itself out, whore.[4]

Ms. Volosevich blocked Mr. Davitashvili on Viber at the end of May 2020. But the two communicated over other messaging applications like Facebook Messenger in June 2020 before Mr. Davitashvili blocked Ms. Volosevich allegedly for mentioning divorce.

The two did not communicate again until February 2021 when Mr. Davitashvili contacted Ms. Volosevich using a different Facebook account. Mr. Davitashvili asked Ms. Volosevich in April 2021 if she filed her tax returns as "married filing jointly" in 2019 and 2020 and collected COVID-19 stimulus payments when they separated and he lived in Georgia. Ms. Volosevich allegedly did not provide a "straight answer."

Mr. Davitashvili also communicated with an individual named Roma during his time in Georgia.[5] The United States alleges Roma is an acquaintance of Mr. Davitashvili.[6] According to the United States, Roma showed Ms. Volosevich Mr. Davitashvili's messages to him, causing her

to become "alarmed" and "her concerns [to] bec[o]me heightened."[7] We do not know when Ms. Volosevich saw these messages; the United States represents and Mr. Davitashvili does not dispute it allegedly occurred before Ms. Volosevich reported Mr. Davitashvili to the FBI on May 12, 2021. The United States filed a complaint against Mr. Davitashvili, and Judge Strawbridge issued a warrant for his arrest.[8]

Mr. Davitashvili returned to the United States from Georgia in early June 2021. The FBI arrested Mr. Davitashvili upon his arrival. Our grand jury then charged Mr. Davitashvili with transmitting a communication containing a threat to injure or kidnap in interstate or foreign commerce under 18 U.S.C. § 875(c).[9] Our grand jury specifically charges: "Davit Davitashvili knowingly and willfully transmitted in interstate and foreign commerce a communication, that is, messages using the Internet messaging application Viber, to O.V., a person known to the grand jury, which contained threats to sexually assault the mother of O.V., to injure, maim, and kill O.V., and to kill others. All in violation of Title 18, United States Code, Section 875(c)."[10] The United States represents it will go before the grand jury once again to drop the charge regarding threatening to sexually assault Ms. Volosevich's mother because this resulted from a mistranslation of Mr. Davitashvili's message.[11]

We proceed to trial on June 15, 2022.[12]

## II.   Analysis

The United States moves before trial for an Order allowing Ms. Volosevich's testimony about the physical and emotional abuse during their marriage, an alleged October 2019 rape, messages between Mr. Davitashvili and Ms. Volosevich before and after the May 10, 2020 messages, messages between Mr. Davitashvili and Roma after May 10, 2020, and Mr. Davitashvili's 2007 conviction for domestic violence. The United States argues all the proffered

evidence is intrinsic, or alternatively, admissible "other acts" evidence under Federal Rule of Evidence 404(b). Mr. Davitashvili opposes the admission of this evidence, regardless of whether the evidence is intrinsic, arguing its unfair prejudice substantially outweighs its probative value. We held oral argument and set an evidentiary hearing to meet our obligation of studying each proffered piece of evidence under Rule 404. We have now parsed hundreds of messages with little guidance from the United States until its most recent explanations Ms. Volosevich's messages are not offered for the truth but instead for their effect on the listener Mr. Davitashvili.

We first consider whether the proffered evidence is intrinsic, and if not, whether it is admissible under Federal Rule of Evidence 404. We find only the messages from May 10, 2020 for which Mr. Davitashvili is charged are intrinsic evidence. But we admit many of the proffered messages and Ms. Volosevich's testimony regarding physical and emotional abuse from November 2019 through June 2020 under Rule 404(b). We exclude the introduction of a 2007 conviction, an alleged October 2019 rape, and several tangential messages between the estranged husband and wife where the unfair prejudice and often cumulative effect outweighs the probative value.

A.      The proffered evidence is not intrinsic evidence of the charged conduct except the May 10, 2020 message exchange.

The United States first argues all the evidence it proffers is intrinsic evidence because it demonstrates Mr. Davitashvili's intent to transmit a threat or knowledge Ms. Volosevich would perceive it as a threat on May 10, 2020, both of which relate to the state of mind set by Congress for conviction. Our Court of Appeals instructs intrinsic evidence includes evidence which "directly proves" the charged offense and "uncharged acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime."[13] All other evidence must be analyzed under Federal Rule of Evidence 404(b).[14]

We find only the May 10, 2020 message exchange is intrinsic evidence under our Court of Appeals's guidance. The United States must prove beyond a reasonable doubt on May 10, 2020 Mr. Davitashvili (1) knowingly transmitted a communication; (2) containing a threat to kidnap or injure a person or group of people;[15] (3) for the purpose of making a threat or knowing the communication would be viewed by Ms. Volosevich as a threat, *i.e.* he acted with intent to threaten; and, (4) in interstate or foreign commerce.[16] The United States contends all the proffered evidence is intrinsic because it directly proves Mr. Davitashvili's intent to transmit a threat on May 10, 2020. The United States offers the complete message exchange between Mr. Davitashvili and Ms. Volosevich from May 10, 2020, including the portion of the exchange containing the alleged threats.[17] We agree this message exchange is intrinsic evidence of the charged crime.[18] Mr. Davitashvili is charged with transmitting a threat to injure Ms. Volosevich and others through interstate or foreign commerce because of his messages in this May 10 exchange.[19] This message exchange tends to directly prove the charged conduct and is admissible, intrinsic evidence.

But we disagree the remaining proffered evidence is intrinsic evidence of the charged crime. The remaining evidence does not "directly prove" the offense. It at best provides circumstantial evidence of Mr. Davitashvili's subjective intent on May 10, 2020; but it is not direct evidence of his intent and thus it does not "directly prove" the crime.[20] If we found all prior acts which are probative of an intent element of a crime are intrinsic, we simply would not need Rule 404(b), which is clearly an absurd result. Although the United States does not argue the conduct is "contemporaneous" conduct which facilitated the charged crime, we independently conclude based on the record before us it is not. The proffered evidence spans months before the charged conduct to a year after it. Besides the May 10, 2020 communication, none of the other conduct is contemporaneous. Thus, the United States has not shown (after hearings) the evidence it seeks to

admit is intrinsic evidence of the crime charged here. We review the remaining evidence under Rule 404(b).

### B.    We admit some but not all the proffered evidence under Rule 404(b).

We next determine whether this evidence is admissible under Rule 404(b). Rule 404(b)(1) provides: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."[21] While excluding evidence of an individual's "other acts" to show propensity, Rule 404(b)(2) permits admission of other-acts evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[22] "Rule 404(b) is a rule of exclusion, meaning that it excludes evidence unless the proponent can demonstrate its admissibility, but it is also 'inclusive' in that it does not limit the non-propensity purposes for which evidence can be admitted."[23] "Admissibility under Rule 404(b) requires the satisfaction of four distinct steps: (1) the other-acts evidence must be proffered for a non-propensity purpose; (2) that evidence must be relevant to the identified non-propensity purpose; (3) its probative value must not be substantially outweighed by its potential for causing unfair prejudice to the defendant; and (4) if requested, the other-acts evidence must be accompanied by a limiting instruction."[24] Our Court of Appeals directs us to "critically analyz[e] each of the four steps in the methodological process for determining admissibility under Rule 404(b)."[25]

At step one we consider whether the United States offers the evidence for a proper, non-propensity purpose.[26]

At step two, we must consider whether the United States has shown the evidence is relevant for the non-propensity purpose.[27] Evidence is relevant if "it has any tendency to make a fact more

or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."[28] For evidence offered under Rule 404(b) to be relevant, the "proffered evidence must fit into 'a chain of inferences—a chain that connects the evidence to a proper purpose, no link of which is a forbidden propensity inference.' '[T]his chain [must] be articulated with careful precision because, even when a non-propensity purpose is 'at issue' in a case, the evidence offered may be completely irrelevant to that purpose, or relevant only in an impermissible way.'"[29] We must not "'merely inquire of the prosecution what it wishes the evidence to prove' but rather put the Government to the task of explaining how the evidence 'should work in the mind of a juror to establish the fact the government claims to be trying to prove.'"[30] We thus must ask the United States "how the proffered evidence should work in the mind of a juror to establish" Mr. Davitashvili's intent to threaten Ms. Volosevich or provide background and context of the parties' relationship leading up to May 10, 2020.[31]

At step three, we must perform the balancing test required under Rule 403.[32] The "third step requires that other-acts evidence must not give rise to a danger of unfair prejudice that substantially outweighs the probative value of the evidence under Rule 403 of the Federal Rules of Evidence. Rule 403 states: 'The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice.'"[33] "Rule 403 'creates a presumption of admissibility.' 'Evidence cannot be excluded under Rule 403 merely because its unfairly prejudicial effect is greater than its probative value. Rather, evidence can be kept out only if its unfairly prejudicial effect 'substantially outweigh[s]' its probative value.' Nevertheless, district courts must undertake some analysis, i.e., provide 'meaningful balancing,' when applying Rule 403 to determine the admissibility of Rule 404(b) evidence."[34]

At step four, we must provide a limiting instruction regarding the other-acts evidence if Mr. Davitashvili requests one.[35] Our instruction must "advise[] the jury that the evidence is admissible for a limited purpose and may not be considered in another manner."[36]

Consistent with our obligation to "critically analyz[e] each of the four steps in the methodological process for determining admissibility under Rule 404(b),"[37] we review each proffered piece of evidence offered by the United States to determine whether it satisfies steps one through three of our inquiry. We begin with step one—a proper purpose. The United States seeks to offer the evidence to show Mr. Davitashvili's intent to transmit a threat and as background evidence to "complete the story" and provide context to the May 10, 2020 messages, both of which are proper purposes apparent from the record.[38] The United States may prove intent by proving Mr. Davitashvili transmitted the communication for the purpose of making a threat or with knowledge Ms. Volosevich would perceive his communication as a threat. Mr. Davitashvili's knowledge—another proper 404(b) purpose—is thus also at issue. Mr. Davitashvili concedes these are proper purposes.[39] We agree the United States offers the evidence for a proper, non-propensity purpose.[40]

At steps two and three, our inquiry is whether the evidence is relevant to the proper purpose and whether it passes muster under the Rule 403 balancing test.

The United States today bears the burden to articulate the chain of propensity-free inferences for each piece of evidence offered.[41] It did not do so; it merely argues *all* the proffered evidence under Rule 404(b) meets the relevance standard for intent, knowledge, and background through a cursory analysis not specific to each piece of evidence or groups of evidence. We need to review each piece of evidence. Consistent with our Court of Appeals's guidance and like Judge Hardy's approach to similar allegations in *United States v. Miah*, [42] we undertake the "precision-

laden analysis" for each piece of proffered evidence. But we note the difficulty in undertaking such analysis when the United States did not offer the chain of inferences needed or merely provides "cursory articulations" of the chain of inferences, and Mr. Davitashvili objects to most, if not all, of the evidence under Rule 403's balancing test with no attempt to differentiate between the types of evidence either. We are left with discerning the individual bases for each piece of evidence to ensure an orderly trial.

### 1. We permit Ms. Volosevich's testimony about Mr. Davitashvili's alleged abusive conduct and dysfunctional relationship from November 2019 through June 2020.

The United States seeks to admit Ms. Volosevich's testimony regarding Mr. Davitashvili's past verbal and physical abuse during their marriage. Mr. Davitashvili, a former mixed martial arts fighter, allegedly: hit Ms. Volosevich where others could not see the marks, threatened to kill her, threatened to disfigure her face with acid or a knife, would use his former domestic violence conviction from 2007 to intimidate or threaten Ms. Volosevich, and raped her in October 2019 leading to their separation. We address Ms. Volosevich's general testimony about past abuse, and then analyze the alleged rape and 2007 domestic violence conviction.

Ms. Volosevich intends to testify about Mr. Davitashvili and her marriage, including past verbal and physical abuse. Ms. Volosevich intends to testify Mr. Davitashvili is a trained mixed martial arts fighter, previously hit her, threatened to kill her, and threatened to disfigure her face with acid and a knife. Mr. Davitashvili and Ms. Volosevich married in 2016 and separated in 2019. They were together for approximately nine years in total.

We agree with the parties this evidence is relevant to provide background and context to Mr. Davitashvili and Ms. Volosevich's relationship, and it tends to prove Mr. Davitashvili knew Ms. Volosevich would perceive his communication on May 10, 2020 as a threat. The United States

is not offering the evidence to prove because Mr. Davitashvili abused and threatened Ms. Volosevich before, he also did so on May 10, 2020. Rather, the United States is offering this testimony to provide background and context as well as to prove Mr. Davitashvili's subjective intent to transmit a threat. Because Mr. Davitashvili abused and made threats to Ms. Volosevich before, it is more probable on May 10, 2020 he knew Ms. Volosevich would perceive his communication as a threat in light of their history. We find no propensity link in the chain of inferences.

And this testimony's probative value is not substantially outweighed by the danger of unfair prejudice or confusing the issues for the jury. The United States must be able to present its case to the jury, which requires the United States to present evidence about who Mr. Davitashvili and Ms. Volosevich are, how they know each other, the background and context of their relationship, and their separation consistent with our holding today on the alleged rape and 2007 conviction. The context of their relationship is highly probative to the central issue of Mr. Davitashvili's subjective intent to transmit a threat in May 2020. It is of course prejudicial to Mr. Davitashvili for the jury to hear the volatile nature of their relationship, including allegations of domestic violence. But the probative value of providing context for Mr. Davitashvili's May 10, 2020 communication and to show his intent is not substantially outweighed by the risk of unfair prejudice. We do not exclude evidence merely because it is prejudicial. But we cannot permit Ms. Volosevich to testify about the past abusive conduct for the entire duration of their marriage because as the conduct becomes more attenuated from the date of the charged conduct, the probative value diminishes, changing the calculus of the Rule 403 balancing test. We limit Ms. Volosevich's testimony to events occurring close in time to the charged conduct, specifically those from November 2019 through June 2020.

### 2.   We preclude Ms. Volosevich's testimony regarding an alleged October 2019 rape.

The United States proffers Ms. Volosevich's testimony Mr. Davitashvili raped her in October 2019 leading to their separation and immediately preceding Mr. Davitashvili's return to Georgia in November 2019. The United States argues the evidence is relevant because it makes it more probable than not Mr. Davitashvili transmitted the communication for the purpose of threatening Ms. Volosevich or with knowledge Ms. Volosevich would perceive his message as a threat. The United States also argues it provides background evidence to "complete the story." Mr. Davitashvili does not contest relevancy or proper purpose. He argues an allegation of rape is so inflammatory the unfair prejudice substantially outweighs the probative value of this allegation. We agree with Mr. Davitashvili and exclude references to the alleged rape.

We agree with the parties Ms. Volosevich's allegation Mr. Davitashvili raped her in October 2019 tends to make it more probable he knew Ms. Volosevich would perceive his message on May 10, 2020 as an actual threat and is thus relevant to proving Mr. Davitashvili's mental state. Based on the record before us, Mr. Davitashvili knew Ms. Volosevich perceived the encounter in October 2019 as Mr. Davitashvili raping her, although he denied he did so. Thus, this allegation makes it more probable Mr. Davitashvili intended to transmit a threat on May 10, 2020.

But while relevant, the probative value is relatively low, and we find the risk of unfair prejudice and confusing the issues to the jury in raising a rape allegation substantially outweighs the probative value. The fact Mr. Davitashvili may have raped Ms. Volosevich in October 2019 is not "smoking gun" evidence which conclusively proves his intent in a text message sent from thousands of miles away over six months later. It is of course, relevant, but has a low probative value of proving the intent element. And the probative value of providing background and context

14

is even less here considering the other evidence we are permitting for this purpose. On the other side of the scale, we must weigh the risk of unfair prejudice and confusing the issues for the jury.

We find both factors heavily counsel exclusion of the rape allegation. An uncharged rape is highly incendiary and will inflame the emotions of the jury, risking a verdict based on emotion and not evidence. Allowing testimony about this allegation will create a side show between the United States and Mr. Davitashvili about whether he raped his wife in October 2019, substantially confusing the central issues in this case. And this testimony is unnecessary to prove the United States' case when considering the other evidence. The jury will have plenty of background and context to understand Mr. Davitashvili and Ms. Volosevich's relationship leading up to the May 10, 2020 messages without hearing this highly prejudicial allegation. Because the evidence is unnecessary to prove the United States' case, has minimal probative value to the non-propensity purposes, and creates an extremely high risk of unfair prejudice and a side-trial about whether Mr. Davitashvili raped Ms. Volosevich, we exclude the evidence of an alleged rape under Rule 403's balancing test.

Ms. Volosevich may not testify to the alleged rape in October 2019.

### 3.  We preclude Ms. Volosevich's testimony about a 2007 conviction.

Ms. Volosevich intends to testify Mr. Davitashvili threatened and intimidated her by referencing his 2007 domestic violence conviction.[43] We know now from studying the record the couple discussed the alleged victim of the domestic violence, Anya, in their messages. The United States seeks to admit the evidence to prove Mr. Davitashvili's subjective intent and whether the

May 10, 2020 messages contain a "true threat." The United States argues the evidence is relevant for both purposes again without offering the specific chain of inferences with no propensity link.

We disagree a 2007 conviction is relevant to Mr. Davitashvili's intent in May 2020 to issue a threat. We also disagree the 2007 conviction is relevant to whether Mr. Davitashvili transmitted a true threat in May 2020. The United States does not provide, and we do not see, a chain of inferences *without* a propensity link to prove he intended to transmit a threat in May 2020 or an objectively reasonable person would view Mr. Davitashvili's communication on May 10, 2020 as a threat because he committed domestic violence in 2007. But even if we did find relevance, any probative value in showing background or "completing the story," Mr. Davitashvili's intent, or the communication contained a "true threat" is substantially outweighed by the risk of unfair prejudice to Mr. Davitashvili. The conviction is substantially attenuated in time. It involves a crime which tends to inflame juror emotions against a different individual, not Ms. Volosevich. And its probative value, if any, is minute.

We exclude evidence of Mr. Davitashvili's 2007 conviction.

### 4.  We admit many but not all of Mr. Davitashvili's admissions in messages to Ms. Volosevich and Roma under Rule 404(b).

The United States belatedly offered nearly 300 pages of messages between Mr. Davitashvili and Ms. Volosevich, and Mr. Davitashvili and Roma.[44] The United States again declines to articulate the chain of inferences to establish the messages' relevance to the proffered non-propensity purposes: background, intent, and knowledge. Nor does the United States attempt to group the messages and provide a chain of inferences for each group of messages. The United States instead asks us to do its job, merely providing us a cursory, conclusory analysis *all* the Rule 404(b) evidence it seeks to introduce is relevant for a proper purpose. We must undertake the analysis required of us to determine with precision whether the messages proffered by the United

States are relevant and fit within a chain of inferences with no propensity link and if so, whether it passes muster under Rule 403. We note our concern with the United States' cavalier approach to explaining how this Rule 404(b) evidence could be admissible.

We find:

| Message Sought to Admit | Ruling | Analysis |
|---|---|---|
| 10/30/2019–11/1/2019<br><br>ECF Doc. No. 44 at 1–7. | Denied | The United States seeks to admit "[t]ext messages sourced from [Ms. Volosevich's] cell phone between her and the defendant for 10/20/2019."[45] There is no such text message. At oral argument, the United States told us it sought admission of the messages from October 30 to November 1, 2019.[46] We presume "10/20/2019" is a typographical error considering we do not have the message, and we analyze the messages the United States argued before us.<br><br>The United States proffers text messages between Ms. Volosevich and Mr. Davitashvili from October 30 to November 1, 2019, which are close in time to their separation but over six months before the charged conduct. It appears from the messages Mr. Davitashvili is accusing Ms. Volosevich of cheating on him and he calls her names. At oral argument the United States argued these messages are relevant because they show Mr. Davitashvili had hostility towards Ms. Volosevich which tends to prove his motive and intent to threaten Ms. Volosevich on May 10, 2020. The United States also contends it provides background context of the parties' separation and associated hostility post-break up.<br><br>These messages are minimally relevant to Mr. Davitashvili's state of mind for the charged conduct. He is evidently upset with Ms. Volosevich and feels she cheated on him. We do not find these messages to be proper background evidence when Ms. Volosevich can testify to the context of their separation and relationship. Because the probative value of these messages for Mr. Davitashvili's state of mind is low, and the risk of unfair prejudice is high, the risk of unfair prejudice substantially outweighs the probative value. We exclude these messages. |
| 10/30/2019<br><br>ECF Doc. No. 44-1 at 19 | Denied | Mr. Davitashvili sent Ms. Volosevich a video message and then told her to watch it until the end, and "she will be finished." He wishes "God" to "pay [her] for this." He asks her if she watched the video, he calls her a whore, and tells her to "think." The video is apparently a man in a kitchen filming around the kitchen speaking in Russian. He then zooms into a camera hidden under a cabinet. We have no context for the video. We have no idea who the person in the video is nor do we know whose residence is being filmed. We have no translation of what is said. |

| | | |
|---|---|---|
| | | The United States wholly fails to meet their burden for this message. We have no context for this video. We have no context for the messages with the video. We do not know who took the video or what the individual says in the video. We cannot even make a preliminary relevance determination, let alone find this evidence relevant for a non-propensity purpose. We cannot admit this evidence. |
| 11/4/2019<br><br>ECF Doc. No. 44-1 at 19–21 | Denied | Mr. Davitashvili seemingly accuses Ms. Volosevich of cheating. He calls her a traitor. He tells her he is "in the state of agony" now, but he "will wake up and come back. Will fuck both in bed." We do not know who he is referring to. Mr. Davitashvili tells her he's sorry he is her husband and exclaims "Who have I involved myself with!" He tells her she is wrong for thinking someone else will protect her, and "[t]hese former cops will use [her] against any person if they need to use [her]." We have no context of who he is talking about. Mr. Davitashvili tells Ms. Volosevich she ruined herself, he "feel[s] sad that [he] lost both of [them]," and says "[b]ut pussy does not answer for it. Men, if you can call him a man, will always answer."<br><br>Absent testimony from Ms. Volosevich at our evidentiary hearing—which we welcomed from the United States but which the United States declined to adduce—we can only take these messages at face value. These messages appear to be post-separation messages where Mr. Davitashvili accuses Ms. Volosevich of cheating on him six months before his charged conduct and immediately after the two separated in October 2019. Many of the comments make no sense or have no context for us to begin to understand them. It is undeniable Mr. Davitashvili is upset in these messages. But they are six months before his charged conduct. And Ms. Volosevich can surely testify as to their break-up and whether it was hostile. These messages have very little probative value, if any. Rule 403 counsels against the messages' admission. The probative value is minimal, and the risk of unfair prejudice to Mr. Davitashvili for the jury to hear and review his post-break up messages he sent Ms. Volosevich half-a-year before his charged conduct is significant. |
| 11/7/2019<br><br>ECF Doc. No. 44-1 at 21–26 | Granted in part;<br>Denied in part | Ms. Volosevich opens the conversation asking Mr. Davitashvili: "Where are the icons", "[w]here's my iPhone? Where's everything?" Mr. Davitashvili and Ms. Volosevich then continue their communications about cheating. It appears they argued on an unspecified date leading Ms. Volosevich to leave the house, and Mr. Davitashvili believes she cheated on him when she left. He calls her names, like "bitch" and "whore." He tells her she is a sinner, and God will not forgive her. He mentions "[h]andcuffs are waiting for [her]." At various points Ms. Volosevich tells Mr. Davitashvili to stop scaring and threatening her.<br><br>We admit the messages beginning at 8:53 AM to Mr. Davitashvili's message at 9:31 AM. The parties are discussing their separation, with Mr. Davitashvili making several concerning comments to Ms. Volosevich in this exchange. Ms. Volosevich accuses him of scaring and threatening her after she reads his |

| | | |
|---|---|---|
| | | messages. The United States does not offer her messages for the truth but rather to show their effect on him. His responses are relevant. For example, he accuses of her of instigating him in response to her saying he is threatening and scaring her. Mr. Davitashvili's messages are relevant to show the background and context of their separation. They are also minimally probative of his state of mind at the time of the charged conduct. We find these messages distinguishable from the messages on November 4 because we do not need additional context to see the relevance in Mr. Davitashvili's admissions. There is no propensity link in our relevance determination. We also find this message exchange meets the Rule 403 balancing test. The messages are probative. While his admissions are prejudicial, the probative value is not substantially outweighed by the risk of unfair prejudice. We admit these messages.<br><br>We exclude the remaining messages for the reasons we exclude the November 4th messages. We have no idea what "icons" are or their significance to this case. The parties then discuss cheating and various individuals we do not know. Ms. Volosevich will testify to the context of their break-up. This evidence is unnecessary considering the other evidence we are admitting. And the risk of unfair prejudice substantially outweighs the minute probative value, if any, of the remaining messages. We exclude the remaining messages in this exchange. |
| 11/8/2019–<br>11/9/2019<br><br>ECF Doc. No.<br>44-1 at 25–26 | Denied | Mr. Davitashvili continues to communicate with Ms. Volosevich about the alleged cheating. He tells her: "[y]our icons are where your new house is, on Rutland St." He tells her she's a sinner and "[i]cons won't help you. Even a monastery won't help [her.]" He accuses her of trying to poison him by mixing something in his food and calls her a murderer.<br><br>This communication again contains accusations of cheating and messages with no context or explanation as to what they are referring to. We do not know what icons are or what significance they may have had in Mr. Davitashvili and Ms. Volosevich's relationship. It is clear Mr. Davitashvili thought Ms. Volosevich cheated on him leading to their separation or around the time of their separation. He evidently thinks she tried to poison him before they separated. To the extent these messages are minimally relevant background evidence or evidence of Mr. Davitashvili's state of mind, they are unnecessary considering the other evidence we are admitting. They are temporally remote in time, lending support to exclude them. The risk of unfair prejudice or confusing the issues substantially outweighs minimal probative value. We exclude this exchange. |
| 12/8/2019<br><br>ECF Doc. No.<br>44-1 26–32 | Denied | The breakup conversation continues. Mr. Davitashvili identifies people they both presumably know and tells her she is free to have sex with any of them. She accuses him of abusing her. She sends him all capital-letter text messages accusing him of hanging at bars and giving away all his money to a friend. She denies cheating on him emphatically. She accuses him of threatening to send her to jail, and she tells him he should be happy she did not send him to jail when he abused her. He denies threatening her and tells her the law is |

threatening her. She accuses him of leaving her in the United States with nothing when he went back to Georgia. He again accuses her of poisoning him. She accuses him of threatening her again. They discuss divorce. He tells her he has socks she unwrapped with "her little hands" and he's looking at them. She again accuses him of threatening her. He accuses her of cheating, betrayal, and working against him. She does not respond.

These messages require us to consider the United States' and Mr. Davitashvili's supplemental hearsay briefing.[47] The United States first argued Ms. Volosevich's messages are admissible for their truth because they occurred in the context of a conversation.[48] We held argument at the April 13 hearing, as well as our previous hearing, where we informed the United States we had no authority supporting its assertion a "conversation" exception to hearsay existed. We permitted supplemental briefing. The United States now explains it is not offering Ms. Volosevich's messages for the truth of the matter asserted, and thus they are not hearsay.[49] The United States now argues it is offering her messages for the effect on the listener. Mr. Davitashvili counters if the United States is not offering her messages for the truth of the matter, the messages are irrelevant and Rule 403 counsels against their admission.[50] Neither dispute Mr. Davitashvili's messages come in for their truth as an opposing party statement.

We begin our analysis with Mr. Davitashvili's messages in this conversation. Mr. Davitashvili's messages focus on allegations of: cheating and moving; Ms. Volosevich poisoning him; telling her the law threatens her, not him; calling her a fool; indicating her "heroes" tell him things; telling her he will file for divorce at the embassy; discussing white socks which she apparently unwrapped "with her little hands." He makes one comment in this exchange telling her he "wrote [her] life 10 years ago. Do what I am saying because it's going to get worse for you otherwise." Mr. Davitashvili's party admissions have little to no probative value of the issues in this case. They are not facially threatening despite Ms. Volosevich repeatedly accusing him of threatening her. Without more context, such as Ms. Volosevich's testimony explaining why she viewed them as a threat, we do not find the messages relevant to establishing past threats. Mr. Davitashvili's messages also have little value in providing the jury background context for their relationship. Mr. Davitashvili's messages in this exchange have little probative value to the issues in this case, if any at all. We set an evidentiary hearing to allow our evaluation of Ms. Volosevich's testimony; the United States declined to call her. We will not allow it to proffer this explanation before the jury when we set an evidentiary hearing consistent with Rule 104(a) and the United States did not meet its burden then.

We next turn to Ms. Volosevich's messages. They of course have high probative value if offered for the truth. She accuses Mr. Davitashvili of threatening her and abusing her. But the United States tells us it does not seek to offer her messages for the truth. It instead seeks to offer the messages to show their effect on Mr. Davitashvili.

| | | |
|---|---|---|
| | | While this is a proper non-hearsay purpose, we struggle to see how this message exchange then would be admissible. Mr. Davitashvili's admissions are either wholly irrelevant in the case because we lack a meaningful context for them or have minimal probative value. Ms. Volosevich's messages and their effect on him produce no relevant evidence in his admissions. Ms. Volosevich's messages are relevant if offered for the truth, but they cannot be offered as such because they are classic hearsay. This message exchange is not relevant. Even if relevant, it has minimal probative value at best given it occurred five months before the charged conduct and fails to provide meaningful, relevant background information about their relationship or his mental state on the date of the charged conduct. Because the probative value is minimal, and Ms. Volosevich's messages are not being offered for the truth, the risk of unfair prejudice with Ms. Volosevich's messages accusing him of abuse and threats is significant. We exclude this exchange. |
| 12/11/2019<br><br>ECF Doc. No. 44-1 33–34 | Denied | There are call bubbles indicating multiple incoming and missed video calls. Mr. Davitashvili then texts Ms. Volosevich someone or something, which the translation says is not in Russian and thus not translated, "will be waiting in Georgia." He tells her she will have two children and then "[they] will talk more." He tells her he "feel[s] bad that you are there." There are additional calls. She tells him to forget her and move on. The conversation ends.<br><br>The relevance of this conversation is lost on us without more context not offered by the United States before, during, or after our Rule 104 hearing. It appears Mr. Davitashvili wants to get back together with Ms. Volosevich and have two children. He expresses sorrow she is in the United States. There are various phone calls. Ms. Volosevich tells him she wants to remain separated, but he never answers this message on December 11.[51] So her text has no purpose to show its effect on him—it evidently had none. And it does not provide relevant context to the "conversation." We exclude this message exchange. |
| 12/17/2019[52]<br><br>ECF Doc. No. 44-1 at 50–60 | Granted in part;<br>Denied in part | Ms. Volosevich tells Mr. Davitashvili she does not want to talk to him anymore and they broke up. He urges they should be together. She tells him he can continue to threaten her and call her a whore. He tells her he is at fault for things over their nine-year relationship. He tells her they should be together and have kids. They discuss whether they can save their marriage. She tells him not to touch or come near her. He tells her they can save their marriage. She accuses him of rape. She says: "Remember how I asked you not to touch me because I was on my period, and that I had stomachache, and that I took four pills, and what did you do???!!!" She accuses him of being a homeless drug addict before he moved in with her. He tells her he did not rape her and their sexual relations were always consensual. She accuses him again of forcing her to have sex with him. They discuss various people, such as Kupari, Vaso, Vova, and Zaza. He tells her he doubts this is her talking to him. They argue about whether Ms. Volosevich is Mr. Davitashvili's property. Ms. Volosevich says "NOW I |

UNDERSTAND WHY ANIA IS AFRAID OF YOU AND YOU USED TO SHOW IT OFF."

We admit both Mr. Davitashvili and Ms. Volosevich's messages from 2:11 AM to Mr. Davitashvili's message at 2:33 AM ending on page fifty-two.[53] The United States tells us, and we will allow consistent with this Memorandum, Ms. Volosevich to testify about the alleged abuse during their marriage. These messages are relevant as admissions by Mr. Davitashvili as to conduct during the marriage. He admits he is at fault for many things that happened. He acknowledges "[w]hat happened, happened." Ms. Volosevich's messages have a clear effect on him to cause him to make such admissions. This is relevant background information to provide context to their relationship. There is not a propensity link here – *i.e.*, the messages are not offered to prove because Mr. Davitashvili committed wrongs before, he also did so on May 10, 2020. This evidence is relevant to provide background context to the parties' relationship and give credence to Ms. Volosevich's testimony about the nature their marriage. There is no propensity link in our relevance determination. We also find the probative value of this message exchange is not substantially outweighed by the risk of unfair prejudice to Mr. Davitashvili. The probative value of these messages is significant. They are admissions by Mr. Davitashvili as to the context of their relationship including his past wrongs. Mr. Volosevich's messages are not incendiary in this exchange and are being offered to show their effect on Mr. Davitashvili. Her messages to him clearly caused him to respond the way he did. And his admissions otherwise lack context. The messages are relevant and withstand scrutiny under Rule 403. We admit this message exchange.

The next exchange beginning on the top of page fifty-three gets into Ms. Volosevich's allegations of sexual assault. We excluded her testimony on this issue. We exclude the messages for the same reasons.[54]

The next exchange includes Ms. Volosevich telling Mr. Davitashvili they have their own lives, and no one will tolerate him like she did. They discuss unknown individuals and why they came to their home. It seems Ms. Volosevich is implying a friend of Mr. Davitashvili came to their home to be with Ms. Volosevich, although it is not wholly clear and we have no explanation from the United States. Ms. Volosevich says she is not Mr. Davitashvili's property, and she references "Ania", who the United States tells us is an individual Mr. Davitashvili is convicted of abusing. The message about "Ania" is the last message the United States seeks to admit.

The messages from Ms. Volosevich implying Mr. Davitashvili's friend came to their house to be with her and his responses are not relevant. The United States offers no specific argument for these messages. We do not see how they go to Mr. Davitashvili's state of mind nearly five months later. We do not see the relevant background information offered in these messages. And we do not

| | | |
|---|---|---|
| | | understand how the United States can proffer Ms. Volosevich's message regarding Ania, not for its truth, but to show its effect on Mr. Davitashvili without seeking admission of his response to her message. Her late responses are irrelevant context to Mr. Davitashvili's earlier messages. For some reason, the United States does not seek to admit the whole message exchange, his responses to her included. We exclude Ms. Volosevich's messages from 2:40 AM to 2:52 AM. |
| 12/21/2019<br><br>ECF Doc. No. 44-1 at 72–73 | Denied | Mr. Davitashvili asks Ms. Volosevich if she will speak to him. She tells him he called her a whore and accused her of cheating, and she asks him if this is normal. They talk on the phone. She tells him to forget her and stop contacting her. He tells her he wants them to live together in Georgia. He tells her to calm down and asks why she hates him. He then asks if she still loves him deep down.<br><br>We exclude these messages as irrelevant. Ms. Volosevich's messages accuse Mr. Davitashvili of calling her a whore and accusing her of cheating on him and accuses him of making nasty remarks about her. The United States tells us it does not offer her messages for the truth, but to show the effect on Mr. Davitashvili. None of Mr. Davitashvili's messages in response to Ms. Volosevich are relevant to his state of mind on May 10, 2020 or to provide background to their relationship. Mr. Davitashvili asks Ms. Volosevich if she will speak to him, asks how she is, denies talking about her, asks her to calm down and why she hates him, and asks her if she loves him deep down. None of these admissions are relevant to provide background to their relationship or to show his state of mind on May 10, 2020. We exclude this message exchange. |
| 12/24/2019–12/26/2019<br><br>ECF Doc. No. 44-1 at 77–86 | Granted | Mr. Davitashvili asks Ms. Volosevich where she was ten minutes ago on Christmas Eve and asks how her affairs are. He calls her coldhearted. Ms. Volosevich tells him she will no longer listen to him "offend [her] and tell [her] nasty things." He tells her to forget everything bad that happened. He tells her "[t]here was also good." He tells her they will need to decide whether they will stay together or get divorced when he returns to the United States. She tells him no. He tells her they love each other. He tells her he has always protected her with words and actions. She tells him he was the only one who hurt her. He tells her she is mistaken. He tells her not to listen to other people now that they are separated. He sends her pictures of animals. He wishes her a Merry Christmas. He asks her why she is telling Zaza he writes her nasty things. He denies doing so. She wishes him Merry Christmas. He calls her and messages her to answer the phone because he wants to talk. He asks if she hates him. He tells her she is strong and to forget all the bad. He tells her everything can be done within a year. He tells her he will come back healthy and they will have a baby. She does not answer. He says "[s]o it means that I have only done bad to you, yes?! Nothing good, yes?" She does not answer. He tells her they need to live farther away from Philadelphia when he returns. He tells her she is his blood and he is hers. He tells her they should forget the bad and be together. He sends her a video. We do not know what it is on the video and the United States does not |

| | | provide it. He asks her to answer him. She says she has heard everything, he continues to hurt her, and they do not have a future together. He tells her he is not planning to hurt her. He wants to spend time with her. He asks how Marinka is doing. She says he does not need her anymore. |
|---|---|---|
| | | We admit this message exchange. The message exchange here by and large involves admissions by Mr. Davitashvili about the context of their relationship. He at times acknowledges the "bad" and at other times denies doing anything wrong telling Ms. Volosevich he was faithful to her. Ms. Volosevich's messages are admissible to show their effect on him. They are not incendiary in nature and are necessary to explain Mr. Davitashvili's admissions responding to her. This exchange is probative of the background and to provide context to their relationship. There is no propensity link in the chain of inferences here. There is little risk of unfair prejudice in Ms. Volosevich's messages or from admitting Mr. Davitashvili's messages admitting to some "bad" in their relationship. The messages, like almost all of them, will likely require context and explanation from Ms. Volosevich. We admit these messages. |
| 12/27/2019<br><br>ECF Doc. No. 44-1 at 86–89 | Granted | Mr. Davitashvili asks her who she believes. He tells her she pushed him away when he was in a difficult situation. He tells her love is stronger than everything else. He tells her he feels bad she does not have a car and he will buy her one when he returns. He tells her to calm down and wait for him. He will return in January. He tells her it does not matter what happened between them. She tells him he has "the audacity to say [she] left [him] in a difficult situation" and he forgets all she did for him. She tells him he treated her worse than enemies are treated. He tells her he regrets it and he was not in the right state of mind. She accuses him of making everything up. He tells her he wants a child and to live in peace. He has renewed enthusiasm. She tells him he will not have it with her. She tells him she does not want his money even if he makes a million dollars. |
| | | We admit this message exchange. The message exchange here by and large involves admissions by Mr. Davitashvili about the context of their relationship. Ms. Volosevich's messages are admissible to show their effect on him. They are not incendiary in nature and are necessary to explain Mr. Davitashvili's admissions responding to her. This exchange is probative of the background and to provide context to their relationship. We find no propensity link in our chain of inferences. There is little risk of unfair prejudice in Ms. Volosevich's messages or from admitting Mr. Davitashvili's messages discussing the context of their relationship. These messages, like almost all of them, will likely require context and explanation from Ms. Volosevich. We admit these messages. |
| 12/31/2019[55] | Granted | Mr. Davitashvili messages Ms. Volosevich he never did anything bad to her. She disagrees and tells him "[o]h, yes! It's okay to beat your wife's head lightly." She accuses him of cheating on her. He tells her he was not himself after what he saw with his own eyes. She accuses him of calling her names, hurting her, and accusing her of things she does not understand. She tells him |

| | | |
|---|---|---|
| ECF Doc. No. 44-1 at 89–92 | | he left her with no money on the street. She says she used to cry while he sat on the couch high not paying attention. He tells her he regrets it and needed treatment. He tells her he will return healthy.<br><br>We admit this message exchange. The message exchange here by and large involves admissions by Mr. Davitashvili about the context of their relationship. He admits, or at least a juror may infer he is admitting to, the accusations Ms. Volosevich makes. Her messages are admissible to show their effect on him as his admissions make no sense without Ms. Volosevich's messages. We disagree with Mr. Davitashvili's argument if the United States does not seek admission of the messages for the truth of the matter, the messages are irrelevant. The United States need not offer Ms. Volosevich's messages for the truth when Mr. Davitashvili arguably admits to the conduct in his responses to her. Her messages are properly being used to show their effect on him, and *his* responses to her hold the probative value. There is no propensity link in our relevance determination. But, while relevant, we still must do a Rule 403 balancing analysis.<br><br>Ms. Volosevich's messages in this exchange are prejudicial. They accuse Mr. Davitashvili of hitting her, cheating on her, calling her names, accusing her of things, and hurting her, among other things. But Mr. Davitashvili's responses to her accusations are highly probative to provide background and context to the parties' relationship. He arguably admits to the volatile nature of their relationship. The risk of unfair prejudice to Mr. Davitashvili in admitting this message exchange does not come close to substantially outweighing the probative value. We admit this exchange. |
| 01/17/2020<br><br>ECF Doc. No. 44-1 at 111–14 | Granted | Mr. Davitashvili tells her he has an appointment on Monday for an endoscopy and a sperm test. He asks her to call him when she is awake. She refuses because she heard everything yesterday. He tells her to calm down and she's acting crazy. He demands she answer his call. He says "[i]f you don't want to, then fine. Fuck you. I have fucking had it up to here, animal." He continues: "Go to hell. I won't call anymore. Fuck it." He continues to tell her to call him. She refuses because he talks his "nonsense." He tells her she lost her mind. He again accuses her of poisoning him. Hours later he tells her "[i]t's your fault that I am writing this to you."<br><br>We admit this message exchange. Mr. Davitashvili's admissions are relevant to provide background and context to his and Ms. Volosevich's relationship. He shows clear hostility to Ms. Volosevich in his messages, including blaming her for his words to her. It also has minimal relevance to his state of mind on May 10, 2020. There is no propensity link between these messages and the relevant, non-propensity purposes. Ms. Volosevich's messages are admissible to show their effect on him. They do not include inflammatory or incendiary comments. The probative value is not substantially outweighed by any risk of unfair prejudice. We admit this message exchange. |

| | | |
|---|---|---|
| 01/19/2020[56]<br><br>ECF Doc. No. 44-1 at 115–18 | Granted | Mr. Davitashvili tells Ms. Volosevich she has no decency. He tells her she left him when he faced a difficult situation, which no decent wife would do. He tells her she is a bitch and people like her stay bitches. He then tells her he knows who she is involved with and he is using her to get papers. He tells her to go have sex "right and left." He tells her she has her mother's blood. She tells him she does not know why he makes up stuff "but it's only for the sake of making nasty stuff up." She says do not talk about her mother. He tells her he knows she is going out at night and he "always had, have and will have information." He tells her she's a slut and to "continue going out and let yourself be fucked by your fucker." She asks him "[w]hat fucker?" He tells her to forget everything good and bad. He wants to talk to her and "offer something normal and decent."<br><br>We admit this message exchange. But the rule of completeness[57] requires we admit all the messages in the exchange, not just the ones the United States requested. Mr. Davitashvili's messages are relevant to his state of mind on May 10, 2020 as well as to provide relevant background and context to Mr. Davitashvili and Ms. Volosevich's relationship leading up to the charged conduct. There is no propensity link to our relevance determination. The United States does not seek to admit the messages to show Mr. Davitashvili acted in conformity with his previous conduct. The messages are relevant for a proper purpose with no propensity link in the chain of inferences. Ms. Volosevich's messages are admissible to show their effect on Mr. Davitashvili. His messages hold the probative value. The probative value of this exchange is not substantially outweighed by any risk of unfair prejudice or confusing the issues to the jury.<br><br>But we find the United States cannot only admit the messages up to 10:36 AM. Mr. Davitashvili sends two additional messages to Ms. Volosevich regarding the context of their conversation within an eleven-minute span. They jury must see the entirety of the message exchange under the rule of completeness, including Mr. Davitashvili's messages from 10:41 and 10:47 AM. We admit the messages from 4:45 AM to 10:47 AM. |
| 02/07/2020<br><br>ECF Doc. No. 44-1 at 132–34 | Granted in part;<br>Denied in part | There are eighteen missed calls. Ms. Volosevich messages Mr. Davitashvili saying "[l]et bitches answer you. I am not a bitch." He tells her the devil took her soul. They discuss the alleged rape in October 2019. He denies raping her. She tells him they are getting divorced. He accuses her of poisoning him again. He tells her she betrayed him. He tells her she will answer for everything before God.<br><br>We admit the messages from 8:47 AM to 9:28 AM. Mr. Davitashvili tells Ms. Volosevich the devil took her soul in response to her not answering the phone and saying "[l]et bitches answer you." These messages are relevant background |

| | | |
|---|---|---|
| | | evidence and provide some probative value of Mr. Davitashvili's state of mind on May 10, 2020. |
| | | We exclude the messages beginning at 9:48 AM to 10:28 AM. The messages relate to Ms. Volosevich's allegations of sexual assault. We excluded her testimony on this issue. We exclude the messages for the same reasons. |
| | | We admit Mr. Davitashvili's admission at 10:50 AM as relevant background and state of mind evidence. There is no propensity link. The probative value of these messages is not outweighed by any risk of unfair prejudice. |
| 2/16/2020[58]<br><br>ECF Doc. No. 44-1 at 142–46 | Granted | Mr. Davitashvili messages Ms. Volosevich again talking about being together. He sends her photos telling her he is sad. We presume, but no party tells us, the pictures are of himself.<br><br>These messages are relevant evidence to Mr. Davitashvili's state of mind on May 10, 2020 and to provide background and context to Mr. Davitashvili and Ms. Volosevich's relationship. He tells Ms. Volosevich he wants to be with her and is sad. There is no risk of unfair prejudice from these messages. The messages are relevant admissions with no propensity link to establish relevance and satisfy Rule 403. We admit these messages. |
| 02/20/2020[59]<br><br>ECF Doc. No. 44-1 at 147–49 | Granted | Mr. Davitashvili asks Ms. Volosevich to call him if she is ever in the mood so they can talk civilly. He tells her she was in his dream. It appears they talk on the phone, and Mr. Davitashvili messages her he got disconnected. She tells him she does not want to be with him. She accuses him of "tracking her" like he "already [did] with Anya." He tells Ms. Volosevich he needs to keep in contact with her because they spent a lot of time together. He tells her he loves her, and he wants her to remember this message because he is throwing away his phone. He tells her if you know what happened with him and Anya, then he 100% knows she cheated on him. He calls Ms. Volosevich and Anya whores. He tells her to read everything carefully.<br><br>We admit this message exchange. Mr. Davitashvili's admissions hold relevant probative evidence to show his state of mind at the time of the charged conduct and provides relevant background and context to Mr. Davitashvili and Ms. Volosevich's relationship. There is no propensity link in our chain of inferences to determine the messages relevant to a proper, non-propensity purpose. The messages bring up "Anya" who we understand to be the subject of Mr. Davitashvili's 2007 domestic violence conviction, which we excluded from evidence in this Memorandum. Ms. Volosevich will need to provide context for the jury to understand each of their references to Anya. She must do so without referencing this conviction we excluded, but she may testify as to her understanding of Anya and the reason she made the comment to Mr. Davitashvili, eliciting Mr. Davitashvili's probative admission. Ms. Volosevich's messages are admissible to show their effect on Mr. Davitashvili. |

| | | |
|---|---|---|
| | | We need not exclude them as suggested by Mr. Davitashvili because they are not offered for their truth. Mr. Davitashvili's messages in response to Ms. Volosevich hold the probative value.[60] Both Mr. Davitashvili and Ms. Volosevich's messages are admissible. We also conclude the probative value is not substantially outweighed by any risk of unfair prejudice. The messages are highly probative. While prejudicial, the risk of unfair prejudice does not substantially outweigh the probative value here. |
| 02/23/2020[61]<br><br><br>ECF Doc. No. 44-1 at 150 | Granted | Mr. Davitashvili tells Ms. Volosevich "sometimes [she] makes [him] reach a point. And that's why unpleasant things happen." He tells her to calm down and everything will work itself out. He tells her she should think it over and it's not too late.<br><br>Mr. Davitashvili does not object to the admissibility of this statement.[62] We admit this evidence with no objection. |
| 02/29/2020–3/2/2020<br><br><br>ECF Doc. No. 44-1 at 163–66 | Granted | This appears to be a continuation from the February 28, 2020 messages. Mr. Davitashvili tells her he has realized many things on his own. She tells him he did not realize anything; he made it up. Mr. Davitashvili tells her "you are all housewives and whores" and when he returns he "will get the FBI on [their] backs." He tells her the FBI already knows everything, he will not calm down, and she will have to disclose everything when she is "connected to a detector." He says he will "give up all the names that know about this" and "[a] lot of them are criminal already." He tells her he hates her. He tells her Russian Jews took her away from him. He tells her to go check the sugar and she will remember everything. He calls her a whore and dumb. He says if the FBI does not uncover he will wait. She tells him she is not a criminal but he is. He tells her "[f]or now, I don't have a criminal record, but when I do you will be shocked at how much I could be doing. It's better to be a criminal than a two-faced fake." She asks him what right he has to threaten her. He calls her a traitor and continues to talk about the sugar. She tells him to forget about her and leave him alone. Mr. Davitashvili accuses Ms. Volosevich of betraying him by not defending him against "those people who didn't treat [him] well." He calls her a traitor. He tells her she does not want to stand with him and "to fuck them over legally and for everything to work itself out after all." She does not answer.<br><br>Mr. Davitashvili does not object to these messages being admitted. We admit this evidence with no objection.[63] |
| 03/06/2020–03/07/2020 | Granted | There is evidence of missed calls between Mr. Davitashvili and Ms. Volosevich. He asks if she called him and if her "love awakened." She tells him it was an accident. There is a phone call. He sends her a picture of a car and he tells her they will work everything out. He tells her they will live in another state. He says "[w]e have nothing to sort out. No one makes no mistakes." He then says "[s]ee what's happening in the world" and asks her to come to Georgia. He tells |

| ECF Doc. No. 44-1 at 170–73 | | her they will go back once the virus is over. There are more phone calls. He asks her why he should rush back to the United States if there is no chance for him to restore his family.<br><br>We admit these messages from Mr. Davitashvili to Ms. Volosevich. Mr. Davitashvili is discussing their relationship and expressing his desire to be with Ms. Volosevich. Ms. Volosevich does not respond to the messages but there are phone calls between the messages which indicate they may have talked by phone. The messages are relevant to provide background and context to their relationship. There is no propensity link to determine relevance to the proper purpose. We find little to no risk of unfair prejudice by admitting Mr. Davitashvili's admissions about their relationship. If any, the probative value of Mr. Davitashvili's admissions about their relationship is not substantially outweighed by the minimal risk of unfair prejudice. |
|---|---|---|
| 03/14/2020[64]<br><br>ECF Doc. No. 44-1 at 178–81 | Granted in part | It appears Mr. Davitashvili and Ms. Volosevich have a phone call. Mr. Davitashvili messages Ms. Volosevich telling her she is a different person, "like an animal. A stranger. Nothing like the Olya [he] loved." He asks where Olya went. He tells her Philadelphia brings bad memories and they should move to a different state and live happily. She tells him he has no decency. She calls him ungrateful. She tells him she has put up with and forgiven "A LOT." She tells him she is "no Georgian woman that will tolerate everything" and he "belittle[s] [her] like that." He tells her not to cause him to reach his point. He tells her he wants to "restore [their] sweet life" and there is nothing stronger than love. He tells her he is not belittling her, and she should not anger him. He tells her to try restoring their relationship and to give him an incentive.<br><br>We admit these messages. Mr. Davitashvili messages Ms. Volosevich after a phone conversation about the "negative memories" in Philadelphia. She accuses him of having no decency, calling her a whore, and she tells him she will not tolerate this anymore. He responds "OK. Understood. Don't cause me to reach my point." Mr. Davitashvili's admissions provide relevant background and context to their relationship. We find no propensity link in the chain of inferences. Ms. Volosevich's messages are admissible to show their effect on Mr. Davitashvili, but not for their truth. Her messages are prejudicial to Mr. Davitashvili. But the risk of unfair prejudice based on the jury reviewing her messages does not substantially outweigh the probative value of Mr. Davitashvili's admissions in response to Ms. Volosevich's accusations. We admit this evidence. |
| 04/19/2020–04/20/2020 | Granted | There are missed calls between Mr. Davitashvili and Ms. Volosevich. Ms. Volosevich sends Mr. Davitashvili question marks. Mr. Davitashvili tells Ms. Volosevich she is a "hopeless WHORE." She asks if he is normal and how he can say things like that. She calls him. She asks him why he is not answering. She calls him again. She then writes "[a]nd you want to make up???" |

| ECF Doc. No. 44-1 at 209–10 | | We admit the messages on April 19, 2020 and Mr. Davitashvili's message at 2:31 AM on April 20, 2020. Mr. Davitashvili messages Ms. Volosevich she is a hopeless whore three weeks before the charged conduct. This message is relevant to provide background to their relationship in close proximity to the charged conduct and provides probative evidence of Mr. Davitashvili's state of mind. There is no propensity link to our relevance determination. While it may be prejudicial for a jury to read Mr. Davitashvili's message calling Ms. Volosevich a whore, the risk of unfair prejudice does not substantially outweigh the probative value here.<br><br>We also admit Ms. Volosevich's messages and phone calls from 11:35 PM to 11:53 PM on April 20, 2020. The United States separates the messages from April 20 and April 21, 2020 in its submission, but Mr. Davitashvili's message on April 21, 2020 is in direct response to Ms. Volosevich's unanswered messages on April 20, 2020. The messages are admissible to show their effect on Mr. Davitashvili. Ms. Volosevich's messages are not prejudicial. There is no risk of unfair prejudice or confusing the issues to the jury in this message exchange. We admit Ms. Volosevich's final April 20, 2020 messages to show their effect on Mr. Davitashvili. |
| 04/21/2020<br><br>ECF Doc. No. 44-1 at 210–12 | Granted in part; Denied in part | Mr. Davitashvili responds to Ms. Volosevich's message about making up, writing "[n]ot anymore. Forget me. Go with whomever you are with. I have known about it for a while. Well done, whore! You like drug addicts. Fuck you both. Soon many others will find out about it." He tells her not to contact him because she is a "lost cause of a whore." He says: "[i]t's just that I was in a real hurry, otherwise you two would have been behind bars. It's not too late." She asks what he is making up now. She tells him he told her to go to Zaza and now he calls her a whore. He tells her he did not make anything up. He tells her "[y]ou are a whore and it doesn't fucking matter for whom you are spreading your legs, him included. He already got what he fucking deserved once and still cannot calm down." He tells her he does not care and to file for divorce immediately. She asks how much longer he will call her names. He responds "[f]uck you, whore. File for divorce immediately. Fuck you both." He tells her to stop writing to him. He accuses her again of poisoning him. He tells her not to respond, he just wants a divorce. She again responds he told her to go to Zaza and now accuses her of cheating. She tells him he cannot accuse her like that.<br><br>We admit Mr. Davitashvili and Ms. Volosevich's messages beginning April 21, 2020 at 5:08 AM to 7:01 PM. These messages are relevant to provide relevant background and context of the parties' relationship shortly before the charged conduct, including Mr. Davitashvili's thoughts and perception about Ms. Volosevich. It is also relevant to show Mr. Davitashvili's state of mind on May 10, 2020. There is no propensity link in our relevance determination. Ms. Volosevich's messages are admissible to show their effect on Mr. Davitashvili. His messages answer hers directly. Ms. Volosevich's messages are not incendiary or prejudicial. While Mr. Davitashvili's own words are prejudicial |

| | | |
|---|---|---|
| | | to him, they are highly probative evidence to provide context, background, and show his state of mind at or near the charged conduct. The risk of unfair prejudice or confusing the issues does not substantially outweigh the high probative value. We admit the message exchange.<br><br>But we exclude Ms. Volosevich's messages from 7:03 PM to 7:09 PM. The United States only seeks to admit her messages to show their effect on Mr. Davitashvili or to "provide context." Mr. Davitashvili did not answer her messages, so we have no demonstrated effect, and they do not provide relevant context as they occur after the relevant admissions. We thus exclude her messages as irrelevant. |
| 05/9/2020–05/10/2020<br><br>ECF Doc. No. 44-1 at 212–18 | Granted | The texts from May 9, 2020 are the day before the messages for which Mr. Davitashvili is charged with sending on May 10, 2020.<br><br>Mr. Davitashvili asks Ms. Volosevich if she is filing for divorce. He says "[w]hore, go file for a divorce immediately." She asks if he is okay. She calls him. She tells him she never cheated on him, and he cannot keep calling her names. She tells him people know how she lives and she does not need to justify herself. She tells him she is not the enemy.<br><br>He tells her "[i]f so, I will just tell you one thing. When I am back, we will join in together, will forget everything and will start a different life and will go to a different state . . . [w]e will work everything out. I am not your enemy either. These are my final words." She responds: "And now you want to make up? I am no longer a whore?!" He tells her to come clean about everything because she will have to regardless. He tells her not to answer him. She tells him he caused her "such hurt" in her life and trauma which he has not apologized for. He sends her smiley faces. She tells him: "You are calling me names, hurting me, and then you want to make up?!"<br><br>The message exchange for which Mr. Davitashvili is charged, as detailed in full above, begins. We do not include again here.<br><br>Mr. Davitashvili does not oppose the admission of this message exchange. We previously admitted the May 10, 2020 message as intrinsic evidence. We admit the May 9, 2020 message exchange as unopposed.[65] |
| 05/18/2020–05/19/2020 | Granted | Mr. Davitashvili asks Ms. Volosevich to please send him the papers. She responds: "You are accusing me of stealing your documents and are threatening to lock me up for that, and now you are asking me to send them." She sends unintelligible pictures to him. Mr. Davitashvili messages Ms. Volosevich, "Caliber is not here. Please send that one also." She asks why. He asks her again to send it over. She sends an unintelligible picture which appears to be a W2. |

| ECF Doc. No. 44-1 at 219–21 | | In reviewing this message exchange in conjunction with the message exchange from May 19, 2020, it appears the documents Mr. Davitashvili is requesting from Ms. Volosevich are W-2s.[66] The issue of Ms. Volosevich jointly filing tax returns in 2019 and 2020 is relevant to Ms. Volosevich's motive to turning Mr. Davitashvili into authorities as described in our April 28, 2022 Memorandum regarding Mr. Davitashvili's Rule 17(c) subpoenas.[67] We do not see a prejudicial effect on the face of these messages. We admit the messages. |
|---|---|---|
| 05/25/2020<br><br>ECF Doc. No. 44-1 at 222 | Granted | Mr. Davitashvili messages Ms. Volosevich "[w]hore, answer." She responds: "Sorry, this is not a whore. You dialed the wrong number." He calls her a slut and traitor. He continues: "Fuck you. You are a bitch to mess up my life like this. God will not forgive you." She tells him she is no longer in his life and he can do what he wants. He again calls her a whore and he should have kicked her out of the house long ago. He tells her to think about her actions and calls her a whore.<br><br>This message exchange occurred two weeks after the charged conduct. It is in close temporal proximity. Mr. Davitashvili's hostility towards Ms. Volosevich is evident in these messages to her. These messages are probative of Mr. Davitashvili's state of mind two weeks earlier. They make it more likely Mr. Davitashvili intended to threaten Ms. Volosevich or knew she would perceive his messages as a threat. And their relevance to his state of mind does not require a propensity inference. They are of course prejudicial to Mr. Davitashvili. But the probative value is not substantially outweighed by a risk of unfair prejudice. We admit this message exchange. |
| 05/29/2020–05/30/2020[68]<br><br>ECF Doc. No. 44-1 at 223–32 | Granted | Mr. Davitashvili calls Ms. Volosevich a traitor and a whore and tells her to answer the phone. He writes "[f]uck you and your entire family, whoever is looking at this phone right now and not answering, whore." He calls her. She responds by message "[w]hat do you want?" He asks her to file for a divorce and nothing else. They talk on the phone. He messages her "[y]ou know the price. People know your price, whore. And they also know how you treated me, bith [*sic*]." She tells him he continues to hurt and offend her. She tells him this is the only way he knows how to treat a woman. He responds he cannot call her a woman or a wife. He tells her if there is justice she will be locked up or deported. She responds she obeys the law unlike him. He tells her she's a traitor who no one will take seriously. She tells him he always wished she would be arrested or deported, and he always thought about how to frame someone. He responds about a sawed-off shotgun and "Giorgi" and "Chainiz." She responds she hopes he has a nice wife and children and everything to work out in his life.<br><br>He responds: "It's just how could have I made such a mistake? I just rushed into it. Would have caught you with hands and you would not have been able to dump anything you [IL][69] into the toilet. After what you have done to me?! And now you are wishing me all the best!!!" He tells her she is a whore with no decency. He tells her to "[s]hove [her] wishes up to you pussy, just like you |

| | | |
|---|---|---|
| | | once shoved up the medication that you mixed in for me, whore." He calls her a stinky KGB "cunt." He tells her he will find out who she associated with and where she was getting it from. He tells her to go file for divorce. He tells her if the time comes he will get her iPhone out and she will need to answer.<br><br>We admit these messages for the same reasons we admit the messages from May 25, 2020. They occur in close proximity to the charged conduct and are relevant to Mr. Davitashvili's state of mind on May 10, 2020. Their probative value is high. Any risk of unfair prejudice does not substantially outweigh the probative value here. And Ms. Volosevich's messages are admissible to show their effect on him. He directly responds to her messages and some of his admissions have no meaning without her previous message. They are not inflammatory or incendiary. To the extent her messages cause any prejudice, the probative value of the messages as a whole is significant and is not substantially outweighed by the risk of unfair prejudice. We admit this message exchange. |
| 6/13/2020–<br>6/30/2020<br><br><br>ECF Doc. No. 65-3 | Granted | Mr. Davitashvili and Ms. Volosevich message on Facebook. It appears they spoke on Facebook audio call. Ms. Volosevich tells Mr. Davitashvili she recorded their call about Mr. Davitashvili's plans to set her and "Vova" up, and she plans to send it to an attorney. He responds he will do everything by legal means and calls her a "whore." He tells her he is not as corrupt as her and calls her a "slut." She sends his message about her being in a wheelchair, for which he is charged, back to him. He tells her to "[f]uck off, whore" and denies writing it. They debate about whether she has proof he wrote it.<br><br>She tells him they split up eight months ago and she does not know why he is interested in her life. He tells her he is not interested. But he is interested in when she is going to answer for what she did to him. He tells her he is deleting her and he will manage everything on his own. He then says "[w]e were still together. You will answer for everything. I swear, and not only you, whore, but also people who put you on this path. I don't have anything else left for me. Understand and remember that, prostitutes. Don't write ever again." He mentions someone by name who he apparently thinks she is sexually involved with. He calls a "whore." She asks him if he reads what he writes. She denies knowing the person he mentioned. She tells him to stop telling her what to do. He tells her to "[f]uck off, I deleted you" and to stop writing him. He says "[o]therwise, I will find you off, whore. Don't write. I am going to catch up with you on my own." He again calls a "whore," "slut", and "prostitute" and tells her not to speak to him.<br><br>We admit these messages for the same reason we admit the messages from May 25, 29–30, 2020. |

| 12/10/2020<br><br>ECF Doc. No.<br>65-1 at 3–5 | Denied | Mr. Davitashvili messaged an individual named Roma, who allegedly showed the message to Ms. Volosevich prompting her to report Mr. Davitashvili because she "grew alarmed."[70]<br><br>Mr. Davitashvili messages Roma about Mr. Davitashvili being framed with a sawed-off shotgun and he says he will not leave it alone if an investigation is not opened. He says he will not calm down until "Olya is in handcuffs." He tells Roma this all happened behind his back but he knows a lot. He asks what the law will do to him. He says he is waiting for "these people" to "answer before the law." But if they do not answer, "then [he] will handle it himself. That's why [he] [is] not saying names." He again talks about being framed and the law not punishing it. He says "[s]ome don't give a fuck, but it's in my head every day and every second. I don't know who to start with or how many I will be able to handle. Or who to choose to be first, second. But this will not end just like this. I know this 100%."<br><br>These messages are not relevant to provide background context to Ms. Volosevich and Mr. Davitashvili's relationship. The messages have little-to-no relevance to his state of mind on May 10, 2020. The United States does not provide us context or information about Mr. Davitashvili's understanding he was framed with a sawed-off shotgun and Olga's involvement in this. We do not know when this allegation of being framed arose, and whether it would have bore on his mental state seven months earlier. Because these messages wholly lack context, we cannot find them relevant to the proper purposes the United States offers. At oral argument the United States informed us Ms. Volosevich reviewed this message which alarmed her and caused her to report Mr. Davitashvili to authorities. We do not see what in this message alarmed Ms. Volosevich, and since the United States elected to not to call Ms. Volosevich during our Rule 104 hearing, we cannot find the message relevant. But even if the messages are relevant, their probative value seven months after the charged conduct is minute and the risk of unfair prejudice from them high. Rule 403 requires we exclude them. We exclude the messages. |
| March 2021-<br>May 2021<br>Messages<br><br>ECF Doc. No.<br>65-2 | Granted in part;<br>Denied in part | Mr. Davitashvili identified himself to Roma as "Davit from Georgia." He begins talking about someone named Mamuka Sadagashvili and Ramaz Avanashvili. Nearly a month later he asks when Ms. Volosevich will finally answer for everything. He asks how much longer he must wait. He asks where the law and justice are. The next day he sends messages to Roma about his missing COVID-19 stimulus money. He talks about his old boss promising to help him locate the money.<br><br>About three weeks later Mr. Davitashvili begins sending Roma pictures of multiple unknown, unidentified people. There is no context as to who the people are or why he is sending them to Roma, even from Mr. Davitashvili's commentary with each picture. He then says "[t]here are more people, but there's no need for more for now. These people, starting with criminal stuff and |

ending with pedophilia and []sexual nature, are engaged against me." He thinks everything is coming from someone in New York. He asks Roma to relay the information to someone who can help. He tells Roma he will return in a month. He tells Roma he hates corrupt people and calls them jealous. He says he should not have left the United States because the law works justly there.

A few days later he sends more pictures. He asks Roma to pay close attention to everything. He tells Roma the pictures are of "two dumb brothers" who he can erase in one day but he asks what he will gain from that. He asks why no one is working with him and says "[m]ust they erase me?" He tells Roma it has been a challenge to collect all the information and says "[o]r must I punish someone?!"

He continues sending people. It appears Mr. Davitashvili thinks they made stuff up about him. He says he "simply has to share."

We admit Mr. Davitashvili's messages on March 17, 2021 from 10:51 to 11:13 AM because they identify the individual writing the messages.

We also admit his message on April 13, 2021 regarding Ms. Volosevich. We admit his messages on May 8, 2021 from 4:56 PM to 5:35 PM. We admit his message from May 9, 2021 at 10:31 PM. The United States tells us Ms. Volosevich reviewed these messages, which caused her to grow alarmed and report Mr. Davitashvili to the authorities. We agree Mr. Davitashvili's messages here could have alarmed Ms. Volosevich causing her to report Mr. Davitashvili to authorities. He tells Roma he is returning to the United States in a month. He makes other facially concerning comments in the messages. Thus, we admit these messages as relevant context to "complete the story" and as Ms. Volosevich's motive to report Mr. Davitashvili to authorities a year after the conduct for which he is charged. These messages are highly probative evidence. They carry a risk of prejudice to Mr. Davitashvili. But the risk of unfair prejudice does not substantially outweigh the probative value here, especially considering our April 28, 2022 Order allowing evidence of allegedly fraudulently filed tax returns to prove Mr. Davitashvili's theory Ms. Volosevich's reported him because she feared he would report her alleged crimes or misconduct relating to the tax returns and stimulus checks. We admit these messages.

We exclude all remaining messages as lacking context to make a relevance determination. We exclude them as irrelevant.

All of our rulings are subject to proper authentication and subject to Rule 611's prohibition on cumulative evidence.

**5. We will instruct the jury with a limiting instruction at Mr. Davitashvili's request.**

Our Court of Appeals instructs "if requested, the other-acts evidence must be accompanied by a limiting instruction."[71] Having admitted Ms. Volosevich's testimony about Mr. Davitashvili's past abuse and many (but not all) messages between Mr. Davitashvili and Ms. Volosevich and Mr. Davitashvili and Roma, and Mr. Davitashvili requesting we provide a limiting instruction, we will provide a limiting instruction to the jury.[72] Neither party submitted a proposed limiting instruction. We grant leave for the United States and Mr. Davitashvili to submit a proposed limiting instruction related to the Rule 404(b) evidence admitted consistent with this Memorandum on or before May 25, 2022.

## III.    Conclusion

The United States did not present the requisite chain of inferences to demonstrate relevance to the non-propensity purpose on several pieces of its proffered evidence. Mr. Davitashvili challenges much of the proffered evidence under Rule 403 arguing the relevance is substantially outweighed by the risk of unfair prejudice. We undertook the precision laden analysis required by our Court of Appeals to ensure an orderly trial. We will not allow references to the 2007 conviction or to an October 2019 rape. We allow Ms. Volosevich to testify concerning Mr. Davitashvili's statements made to her in November 2019 through June 2020 which relate to Mr. Davitashvili's intent to threaten her with physical harm such as putting her in a wheelchair or to harm other persons and as background evidence. We also admit Mr. Davitashvili's admissions in text messages to Roma concerning his return to the United States as the United States confirms it wishes to adduce affirmative proof why Ms. Volosevich reported his May 10, 2020 text messages a year later. We grant the parties leave to supplement their proposed jury instructions to suggest a limiting instruction on the admitted Rule 404(b) evidence.

[1] We derive these facts from the parties' written submissions and representations at oral argument. *See, e.g.*, ECF Doc. Nos. 43, 49, 68, 69, 72, 78.

[2] *See, e.g.*, ECF Doc. Nos. 44, 44-1 (United States exhibit in support of motion containing communications between Mr. Davitashvili and Ms. Volosevich).

[3] The United States represents Viber is an "Internet messaging application[] that allow[s] the user to send and receive audio calls, video calls, written messages, photos, and videos after downloading the software from the Internet." ECF Doc. No. 43 at 7 n.2.

[4] ECF Doc. Nos. 43 at 7–10, 44-1 at 214–18. We use ECF pagination throughout the Memorandum. We note the United States submits these messages are from May 10, 2020, but the last two messages in the exchange seem to have been relayed on May 11, 2020. *See* ECF Doc. Nos. 43 at 10, 44-1 at 218 (indicating Ms. Volosevich's final message occurred at 4:22 PM on May 10, 2020, and Mr. Davitashvili's last two messages occurred at 3:08 and 3:10 AM but the translation not indicating the last messages occurred on May 11, 2020, not May 10).

[5] ECF Doc. Nos. 65-1 at 1–5, 65-2 at 1–10.

[6] ECF Doc. No. 69, Transcript (Tr.), Apr. 13, 2022, at 42:4–8.

[7] Tr., Apr. 13, 2022, at 43:7–24, 47:17–21, 48:9–17.

[8] ECF Doc. Nos. 1–3.

[9] ECF Doc. No. 9.

[10] *Id.*

[11] Tr., Apr. 13, 2022, at 128:15–129:8.

[12] ECF Doc. No. 62 (granting oral motion for a continuance by Mr. Davitashvili with no objection from the United States).

[13] *United States v. Green*, 617 F.3d 233, 248–49 (3d Cir. 2010).

[14] *Id.* The party "seeking to admit evidence under Rule 404(b)(2) bears the burden of demonstrating its applicability." *United States v. Brown*, 765 F.3d 278, 291 (3d Cir. 2014); *see also United States v. Repak*, 852 F.3d 230, 241 (3d Cir. 2017).

[15] Whether something is a threat is an objective inquiry. Our Court of Appeals instructs: "To satisfy the objective component, the Government must 'prove beyond a reasonable doubt that the defendant transmitted a communication that a reasonable person would view as a threat.' This 'requires the [factfinder] to consider the context and circumstances in which a communication was made to determine whether a reasonable person would consider the communication to be a serious

expression of an intent to inflict bodily injury on an individual.'" *United States v. C.S.*, 968 F.3d 237, 244 (3d Cir. 2020) (quoting *United States v. Elonis*, 841 F.3d 589, 596–97 (3d Cir. 2016)).

[16] *Elonis v. United State*s, 575 U.S. 723, 737, 741 (2015); *Elonis*, 841 F.3d at 596; *C.S.*, 968 F.3d at 244–46.

[17] ECF Doc. No. 72 at 3; *see also* ECF Doc. No. 44-1 at 213–18.

[18] *See Green*, 617 F.3d at 248 (citing *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000) (finding "an act that is part of the charged offense . . . is properly considered intrinsic").

[19] We include the two messages from Mr. Davitashvili seemingly sent on May 11, 2020 subject to the United States' explanation as to this date discrepancy.

[20] *See, e.g.*, *United States v. Miah*, No. 21-110, 2021 WL 5605096, at *6 (W.D. Pa. Nov. 29, 2021); *United States v. Fratus*, No. 20-270, 2021 WL 3145732, at *3 (E.D. Pa. Jul. 26, 2021) (both rejecting United States' argument prior threats directly prove intent element of 18 U.S.C. § 875(c)).

[21] Fed. R. Evid. 404(b)(1).

[22] Fed. R. Evid. 404(b)(2).

[23] *Repak*, 852 F.3d at 241.

[24] *Id.* (citing *Huddleston v. United States*, 485 U.S. 681, 691 (1988)).

[25] *Repak*, 852 F.3d at 242.

[26] *Id.* at 241.

[27] *Id.*

[28] Fed. R. Evid. 401.

[29] *Repak*, 852 F.3d at 243 (internal citations omitted); *see also Brown*, 765 F.3d at 292–93 ("Crucially, the Government must also show that the evidence is relevant to that purpose. To do so, the prosecution must clearly articulate how that evidence fits into a chain of logical inferences, no link of which can be the inference that because the defendant committed [the proffered prior offense], he therefore is more likely to have committed [the charged offense].").

[30] *Repak*, 852 F.3d at 244 (quoting *Brown*, 765 F.3d at 294).

[31] *Id.* (further citations omitted).

[32] *Repak*, 852 F.3d at 241.

---

[33] *Id.* at 246 (further citations omitted).

[34] *Id.* (internal and further citations omitted).

"In *Cook*, we recited several factors to be considered in the balancing process: 'we must balance the actual need for that evidence in view of the contested issues and the other evidence available to the prosecution, and the strength of the evidence in proving the issue, against the danger that the jury will be inflamed by the evidence to decide that because the accused was the perpetrator of the other crimes, he probably committed the crime for which he is on trial as well . . . The treasured principles underlying the rule against admitting evidence of other crimes should be relaxed only when such evidence is genuinely needed and would be genuinely relevant.'" *United States v. Sriyuth*, 98 F.3d 739, 748 (3d Cir. 1996) (citing *United States v. Cook*, 538 F.2d 1000, 1003 (3d Cir.1976)).

[35] *Repak*, 852 F.3d at 241.

[36] *Id.* at 248 (further citation omitted).

[37] *Id.* at 242.

[38] *United States v. Steiner*, 847 F.3d 103, 111 (3d Cir. 2017) (quoting *United States v. Sampson*, 980 F.2d 883, 888 (3d Cir. 1992)).

[39] Our Court of Appeals has held "allowing the jury to understand the circumstances surrounding the charged crime–completing the story–is a proper, non-propensity purpose under Rule 404(b)" and "prior-act evidence is admissible to supply 'helpful background information to the finder of fact.'" *Steiner*, 847 F.3d at 111 (quoting *Green*, 617 F.3d at 247, 250) (internal quotations omitted). But our Court of Appeals noted most cases permitting "background" evidence involve conspiracies and found "[t]here are unique circumstances that render 'background' a proper purpose for admitting prior-act evidence in conspiracy cases." *Id.* at 112. Our Court of Appeals declined to "paint the absolute contours of when prior-act evidence may be admissible to provide background under Rule 404(b)" but noted "when the information needed to understand what happened in a case is straightforward and easily understood without reference to facts that do not bear on the charged offense, forcing extraneous and potentially prejudicial information into the record in the name of 'background' is not defensible under Rule 404(b)." *Id.*

[40] Fed. R. Evid. 404(b)(2) ("[Evidence of any other crime, wrong, or act] may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."); *see also Steiner*, 847 F.3d at 112–13; *Green*, 617 F.3d at 247.

[41] *Miah*, No. 21-110, 2021 WL 5605096, at *7 ("In undertaking this analysis, the Court is mindful of the Third Circuit's often repeated and 'emphatic' admonition that Rule 404(b) must be applied with careful precision, that the Government must explain how the proffered evidence fits into a chain of inferences that connects the evidence to a proper purpose devoid of any link comprised of a forbidden propensity inference, and that this Court must also articulate, with precision, the

logical chain of inferences establishing that the evidence is probative of the permissible non-propensity purpose.") (further citation omitted).

[42] 2021 WL 5605096 (W.D. Pa. Nov. 29, 2021).

[43] ECF Doc. No. 43 at 19.

[44] The United States originally provided us with none of the messages, and then provided us nearly 300 pages of messages with no further indication of which messages it sought to admit. ECF Doc. Nos. 35, 41, 43, 44. In its prehearing notice, the United States then provided a list of all messages it sought to admit one day before our hearing, including new messages between Mr. Davitashvili and Roma not previously included in its Motion *in limine*. ECF Doc. No. 65. In its most recent filing, the United States again provides a new list of messages it seeks to admit. ECF Doc. No. 72. We use the list of messages offered in ECF Doc. No. 72 as the most recent list of proposed messages submitted by the United States, noting the confusion and waste of judicial resources the United States' submissions caused.

[45] ECF Doc. No. 72 at 2 ¶ 4.

[46] Tr., Apr. 13, 2022, at 91:7–92:9.

[47] ECF Doc. Nos. 72, 78.

[48] Tr., Apr. 13, 2022, at 78:24–80:18.

[49] ECF Doc. No. 72.

[50] ECF Doc. No. 78.

[51] He evidently does respond on December 12 based on our logical reading of the messages in sequential order. ECF Doc. No. 44-1 at 34. But the United States does not offer the messages from the 12th, so we decline to analyze a non-existent argument.

[52] The United States seeks admission of the messages from 2:11 AM to 2:52 AM. We analyze these messages only.

[53] We again note we use ECF pagination.

[54] The messages from the top of page fifty-three at 2:33 AM to Mr. Davitashvili's message at 2:39 AM on page fifty-four.

[55] The United States seeks to admit the messages from 12:45 AM to 1:07 AM. The conversation continues to 1:10 AM. Ms. Volosevich accuses Mr. Davitashvili of threatening to disfigure her by cutting her face or throwing acid on her. She accuses him of continuing to hurt her. He responds, though, by accusing her of being a "provocateur" and says "[y]ou wanted me to get locked up and want the same now, too. You will not succeed." The rule of completeness embodied in Federal

Rule of Evidence 106 may require admitting this full exchange occurring within three minutes of the last message the United States seeks to admit if Mr. Davitashvili requests such admission at trial.

[56] The United States seeks to admit the messages from 4:45 AM to 10:36 AM.

[57] Fed. R. Evid. 106.

[58] The United States seeks to admit the messages from 1:03 AM to 3:07 AM. We only analyze these messages. The remaining message not sought occurs five hours after these messages. We need not admit it under the rule of completeness.

[59] The United States seeks to admit the messages from 7:33 AM to 9:56 AM. We only analyze these messages. The previous message at 1:35 AM relates to an earlier conversation the United States does not seek to admit. The rule of completeness does not require we admit the message at 1:35 AM as it is not related to the messages the United States seeks to be admitted.

[60] For example, Ms. Volosevich tells Mr. Davitashvili it is not funny he is telling her he tracks her, to which Mr. Davitashvili responds "[y]ou have to understand one thing. I need to maintain contact with you." Thus, Mr. Davitashvili's response is what holds the probative value, not Ms. Volosevich's accusation eliciting the response.

[61] The United States seeks to admit the message at 3:14 AM. We only analyze this message because the other messages occurred eighteen-hours later and do not relate to this message. Thus, the rule of completeness does not require their admission.

[62] Tr., Apr. 13, 2022, at 98:7–14.

[63] *Id*. at 98:15–99:18. The United States represents it will redact the word "Russian Jews" used by Mr. Davitashvili. Our ruling admitting this exchange requires this redaction.

[64] The United States seeks admission of the messages from 8:23 AM to 9:27 AM. There is no message ending at 9:27 AM. Regardless, the rule of completion requires the admission of the messages until 9:31 AM. Thus, we admit the messages from 8:23 AM to 9:31 AM.

[65] Tr., Apr. 13, 2022, 100:1–7. We also independently find the messages immediately preceding the charged conduct are highly probative evidence of Mr. Davitashvili's intent on May 10, 2020 and to provide background and context close in time to the charged conduct. The messages are highly probative to the proper purposes. The risk of unfair prejudice does not substantially outweigh the probative value here.

[66] A form W-2 is a tax-related document "[e]very employer engaged in a trade or business who pays renumeration, including noncash payments of $600 or more for the year . . . for services performed by an employee" must file. *See* Internal Revenue Service, *About Form W-2, Wage and Tax Statement*,

https://www.irs.gov/forms-pubs/about-form-w-2?msclkid=78a5d580cfad11ec91ff35a3a442d8df (last visited May 9, 2022).

[67] ECF Doc. No. 76.

[68] The United States seeks to admit messages until 5 PM. We only analyze these messages, finding the rule of completion does not require the remaining messages to be admitted. And we further find we could not admit them based on Mr. Davitashvili seemingly deleting all his responses to Ms. Volosevich.

[69] With the proffered message translations, the United States informs us when "[IL]" appears in the translation, the text was illegible for the translator. *See*, ECF Doc. No. 44-1 at 1.

[70] Tr., Apr. 13, 2022, at 47:17–21.

[71] *Repak*, 852 F.3d at 241.

[72] ECF Doc. No. 49 at 13.